In The


 

Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-04-505 CR


____________________



JIMMY WOODARD, JR., Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 159th District Court


Angelina County, Texas


Trial Court No. CR-24823






MEMORANDUM OPINION


 Appellant, Jimmy Woodard, was convicted of deadly conduct. The jury assessed
punishment at fifteen years of confinement. Woodard presents five issues for our review. 
Finding no reversible error, we affirm.

Sufficiency of the Evidence


 In his first and second issues, Woodard contends the evidence is legally and
factually insufficient to sustain his conviction. In reviewing issues of legal sufficiency, an
appellate court views the evidence in the light most favorable to the verdict to determine
whether a rational fact finder could have found each element of the offense beyond a
reasonable doubt. Swearingen v. State, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003);
Conner v. State, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001) (citing Jackson v. Virginia,
443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In Zuniga v. State, 144
S.W.3d 477, 484-85 (Tex. Crim. App. 2004), the Court of Criminal Appeals phrased the
standard for a factual sufficiency review as follows: 

 Considering all of the evidence in a neutral light, was a jury rationally
justified in finding guilt beyond a reasonable doubt? However, there are two
ways in which the evidence may be insufficient. First, when considered by
itself, evidence supporting the verdict may be too weak to support the
finding of guilt beyond a reasonable doubt. Second, there may be both
evidence supporting the verdict and evidence contrary to the verdict. 
Weighing all the evidence under this balancing scale, the contrary evidence
may be strong enough that the beyond-a-reasonable-doubt standard could not
have been met, so the guilty verdict should not stand. 


An appellate court "must give due deference to the fact finder's determinations concerning
the weight and credibility of the evidence and will reverse the fact finder's determination
only to arrest the occurrence of a manifest injustice." Swearingen, 101 S.W.3d at 97. It
is the sole province of the jury to determine the credibility of witnesses and to weigh
contradictory testimony. Cain v. State, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997).

 Section 22.05(b) of the Texas Penal Code, which sets forth the offense of deadly
conduct, provides in part:

 (b) A person commits an offense if he knowingly discharges a firearm at
or in the direction of:

 (1) one or more individuals. . . .

Tex. Pen. Code Ann. § 22.05(b) (Vernon 2003). 

 The complainant, an employee of Wisener Construction, testified that on June 21,
2004, he was working on the roof of a double-wide mobile home. Complainant's work
involved the use of a nail gun, which makes a popping noise. Complainant's employer,
Kevin Wisener, was working with him, but Wisener left to obtain additional supplies. 

 According to complainant, he was using the nail gun when he heard yelling across
the street. He heard someone yell, "Stop all the MF-ing noise, you MF-er." Complainant
identified Woodard in court as the individual who yelled at him. Complainant continued
working. Woodard again yelled at him, saying "I told you to stop all that noise, you MF-er." Complainant was seventy-five to one hundred yards from Woodard's house. Woodard
yelled the same phrase at complainant a few more times, but complainant continued
working. Complainant testified Woodard then yelled, "I'm going to shoot your punk ass,
you MF-er," and he began walking toward his house. Complainant saw Woodard enter
his house. Complainant began nailing another board to the roof. Complainant testified
Woodard then ran out of his house and fired a handgun twice in complainant's direction. 
When complainant heard the first shot, he began to move toward his ladder so he could get
off the roof, and he heard the second shot as he was walking toward the ladder. 
Complainant climbed down the ladder and went behind the house to get out of sight. 
Complainant testified he was shaken by the incident, so he went to a neighbor's house to
call the sheriff's office, but no one was at home. Complainant then returned to the mobile
home and stayed behind it. Complainant continued to watch Woodard's house while trying
to stay out of sight. Complainant observed a white Suburban pull into the driveway, and
he saw three girls emerge from the Suburban. Complainant also saw a man who had been
with Woodard leave in a silver car. 

 When Wisener returned, complainant told him what had transpired. Wisener called
the sheriff's department. Wisener described complainant's demeanor as "wide-eyed and
shaky." Complainant and Wisener went to the corner of the house, and they both observed
Woodard get into a white Cadillac with some girls. Complainant and Wisener decided to
move behind the house to get out of sight. Wisener again called the sheriff's office and
informed them Woodard was coming up the driveway. Complainant and Wisener then saw
two patrol cars approach.

 Complainant testified Woodard did not exit his vehicle until the sheriff removed
him. Complainant gave a statement to Deputies Larry Hight and Tyson Hoover. The
deputies interviewed Wisener. Wisener testified Woodard pointed at him and "said I was
the punk-ass MF that shot at him." Wisener opined that Woodard was "deranged in his
mental capacity, from the statements he was making to the deputies and to me." 

 Deputy Tyson Hoover, a patrol deputy with the Angelina County Sheriff's Office,
testified he received a call on June 21, 2004, about discharging firearms. While en route
to the mobile home where complainant was working, Deputy Hoover saw Woodard pulling
out of the mobile home's driveway. Woodard was driving a white Cadillac, and three girls
were in the car with Woodard. Lieutenant Larry Hight, also with the Sheriff's Office,
arrived at the same time, and moved his vehicle in front of Woodard's car. Woodard
began backing his car up, and Deputy Hoover pulled in behind him. Both officers
approached the car and instructed Woodard to exit the vehicle. Deputy Hoover told
Woodard he was answering a call regarding discharge of firearms. Woodard initially
denied discharging firearms. However, he later said he had been shooting at some dogs
that were tearing up his trash. 

 The officers placed Woodard in Deputy Hoover's patrol car. No weapon was
found. After Deputy Hoover and Lieutenant Hight spoke with complainant, Woodard, and
the girls, the officers decided to arrest Woodard on the charge of discharge of a firearm.
The officers then took Woodard to jail.

 Lieutenant Hight testified he received a call regarding discharge of a firearm, and
he and Deputy Hoover responded. As Lieutenant Hight approached, he observed
Woodard's white Cadillac leaving the driveway of the residence where complainant was
working. Lieutenant Hight activated his vehicle's overhead lights and pulled into
Woodard's lane of traffic to block him. Woodard stopped, but put his car into reverse and
began backing up. Lieutenant Hight drew his weapon and instructed Woodard to get out
of the car. Woodard complied. Lieutenant Hight testified Woodard was being
"belligerent" and was "mostly cursing." Deputy Hoover placed Woodard in handcuffs and
told him he was not yet under arrest. 

 Lieutenant Hight spoke with complainant. Lieutenant Hight described complainant
as "still pretty shook up" and "obviously upset." Complainant told Lieutenant Hight, "the
guy shot at him when he was working on the roof of that house. . . ." Complainant also
told Lieutenant Hight he was alone when the incident occurred. Complainant told
Lieutenant Hight he had been working on the roof of the house, using a nail gun, and a
man across the street had yelled at him to stop making noise and cursed. Lieutenant Hight
testified complainant told him "the subject" said he would shoot the complainant and called
him a "punk ass." Lieutenant Hight testified complainant said he saw the subject go into
the house and come out with a gun, and the subject fired at him. Complainant told
Lieutenant Hight he heard the shot ricochet through the trees, so he left the roof of the
house. Lieutenant Hight described complainant as "very believable." Lieutenant Hight
also spoke to the women who were with Woodard. The women told Lieutenant Hight they
arrived after the incident had occurred. 

 Lieutenant Hight told complainant he needed to come to the office later to make a
statement. Woodard was placed under arrest. Lieutenant Hight asked Woodard where the
weapon was, and Woodard denied having a weapon. Lieutenant Hight stated Deputy
Hoover searched Woodard's vehicle, but he did not find a weapon. Woodard later said
he had fired a weapon at a dog earlier because the dog was getting into his garbage.

 Woodard's sister, Bobbie, testified she and Woodard had exchanged cars, and she
returned Woodard's car to him on the day of the incident. Bobbie's two children and
Elizabeth Barrett, who was dating Woodard, accompanied her to return the car. When
they arrived, Bobbie noticed roofers working across the street. Bobbie and Elizabeth
entered the house, and they found Woodard and several girls sleeping inside. Bobbie
testified Elizabeth awakened Woodard and became angry because there were girls in the
house, so Woodard and Elizabeth began arguing. Bobbie tried to break up the fight, but
Elizabeth then came out with a gun and fired twice. Bobbie testified Woodard was outside
with them when the shots were fired. Bobbie began backing her car up, and Elizabeth then
"took off running through the woods. She didn't have the gun whenever she ran back out
to the road to stop me." Bobbie then picked up Elizabeth, dropped her off at Joc Stop, and
went home. Bobbie testified she never saw Woodard with a pistol or any type of gun. 

 Elizabeth Barrett testified she accompanied Bobbie to Bobbie's mother's home on
the day of the incident. Elizabeth testified Bobbie was driving Woodard's vehicle because
Bobbie and Woodard had switched cars the night before. Elizabeth testified when they
entered the house, three girls were inside, and she became angry. Two girls were in bed
with Woodard, and one was in another bed. Elizabeth then awakened Woodard, who told
her to "tell the roofers across the street to turn the nail guns off." Elizabeth then testified,

 [s]o I told him that if he didn't get them out of the yard, that I was going to
do something crazy and might get a gun or something. So I went in the
kitchen and - because they keep this gun in there that they shoot the dogs -
I mean they shoot at the dogs that try to kill their chickens.


Elizabeth got a gun, told the girls they needed to leave, and fired a shot. Elizabeth
testified Woodard then walked over "to yell at the roofers . . . to tell them what was going
on. And, you know, he was trying to yell at them to turn the machines off so he could tell
them."

 Elizabeth and Woodard continued arguing, and she fired again towards the woods. 
Elizabeth testified,

 [a]nd then after that, I mean, I freaked out and . . . I took off and . . . I ran
through the woods and I . . . chunked the gun, like, into the woods. And .
. . I got . . . halfway because I was going to run to the Joc Stop. But then
I turned around because there was . . . another trail. And, like, I had
jumped in the car with his sister.


Elizabeth then dropped Bobbie off at Joc Stop. Elizabeth had already left when the
sheriff's deputies arrived, but she later gave them a written statement. Elizabeth denied
seeing Woodard with a weapon, but she stated Woodard's parents kept a gun to protect
their chickens from dogs. She also stated Woodard never removed the weapon from her
hand.

 In summary, complainant testified Woodard threatened to shoot complainant, emerged
from his house with a weapon, and fired twice in complainant's direction. Both Wisener and
Lieutenant Hight testified complainant was shaken and upset after the incident. However,
Bobbie Woodard and Elizabeth Barrett both testified it was Barrett who fired the gun. The
jury was required to determine the credibility of the various witnesses and resolve the
conflicts in the testimony. Viewing the record in the light most favorable to the verdict, a
rational jury could have concluded beyond a reasonable doubt that Woodard was guilty of
deadly conduct. See Tex. Pen. Code Ann. § 22.05(b) (Vernon 2003). The evidence is
legally sufficient to support the verdict. Furthermore, considering all of the evidence in a
neutral light, the jury was rationally justified in finding proof of guilt of deadly conduct
beyond a reasonable doubt. See id. The evidence supporting the verdict is not too weak, nor
is the contrary evidence, including the testimony of Bobbie and Elizabeth, so strong that the
burden of proof could not be met. Woodard's first and second issues are overruled. 

Lack Of A Hearing 


 In his third issue, Woodard argues that during the punishment phase of the trial, the
court erred in failing to hold a hearing outside the jury's presence to determine whether
the evidence showed his guilt of an extraneous offense beyond a reasonable doubt. Article
37.07 of the Texas Code of Criminal Procedure does not require the trial court to conduct
a separate hearing, particularly when no objection is made to the evidence offered. See
Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (Vernon Supp. 2005); Welch v. State, 993
S.W.2d 690, 697 (Tex. App.--San Antonio 1999, no pet.)("Neither the statute nor
precedent require a hearing."). Woodard's third issue is overruled.

 Lack Of An Instruction


 In his fourth issue, Woodard contends the trial court erred in failing to give a
reasonable doubt instruction to the jury regarding evidence of an extraneous offense during
the punishment phase. Deputy Hoover testified during the punishment phase, and he
described Woodard as "agitated and somewhat uncooperative" when he put Woodard in
the car. After Deputy Hoover and Lieutenant Hight completed their investigation and told
Woodard he was going to jail, they got into the car and attempted to leave. Woodard then

 became very violent: cussing, kicking the window bars in the car, hitting the
cage, kicking the cage. And so we stopped. I made it a hundred, 200 yards
down the road. And myself and Lieutenant Hight tried to speak with him,
calm him down. That didn't work. He just kept cussing at us and kicking
the doors on the car.


Deputy Hoover testified Woodard threatened the officers that if they opened the door, "the
fight was going to be on." Deputy Hoover and Lieutenant Hight turned on their overhead
lights and sirens and notified the jail they were on their way. The officers asked that they 
"have some people waiting to help us when we got there." Deputy Hoover also stated
Woodard hit the car, the Plexiglas cage, and the window with his handcuffs. Woodard's
behavior continued all the way to the jail.

 According to Deputy Hoover, after they arrived at the jail, the sheriff tried to talk
to Woodard and calm him down, but Woodard continued to yell and curse. Deputy
Hoover characterized Woodard as "one of the most violent people I've dealt with in
working for the sheriff's office." On cross-examination, Hoover testified Woodard was
originally charged with resisting arrest, but that charge was not pursued. According to
Deputy Hoover, Woodard stated, "if he was going to jail, he was going for something
good. He wasn't going for just no reason."

 Woodard argues on appeal that Deputy Hoover's testimony regarding Woodard
resisting arrest was evidence of an extraneous offense and, therefore, the trial court was
required to give an instruction to the jury "that they cannot consider evidence of any
extraneous offense unless it finds beyond a reasonable doubt that Defendant was guilty." 
Woodard also contends Deputy Hoover's testimony that Woodard was "one of the most
violent people I've dealt with in working for the sheriff's office" was heard by the jury
without "any safeguards outlined in Mitchell" and contributed to Woodard's high sentence. 
See Mitchell v. State, 931 S.W.2d 950 (Tex. Crim. App. 1996). Woodard's counsel did not
object to any of Deputy Hoover's testimony during the punishment phase, nor did he object
to the charge or request an instruction at trial. 

 Article 37.07, section 3(a)(1) of the Texas Code of Criminal Procedure provides in
part:

 [E]vidence may be offered by the state and the defendant as to any matter the
court deems relevant to sentencing, including but not limited to the prior
criminal record of the defendant, his general reputation, his character, an
opinion regarding his character, the circumstances of the offense for which he
is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of
Evidence, any other evidence of an extraneous crime or bad act that is shown
beyond a reasonable doubt by evidence to have been committed by the
defendant or for which he could be held criminally responsible, regardless of
whether he has previously been charged with or finally convicted of the crime
or act.


Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (Vernon Supp. 2005). Deputy Hoover
described Woodard as "one of the most violent people," and described his conduct in
resisting arrest. Generally, opinion testimony concerning the character of the defendant is
not "extraneous offense" evidence under section 37.07 requiring a separate burden of proof
instruction. See id.; see also, generally Bluitt v. State, 137 S.W.3d 51, 54 (Tex. Crim. App.
2004) (because prior criminal record of defendant is not included with extraneous offenses,
legislature did not intend to require same instruction for criminal record as for extraneous
offenses). Conduct during an arrest immediately following an offense may in some cases
constitute circumstances of the offense on trial rather than an "extraneous offense." See
Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (Vernon Sup. 2005); see also, e.g.,
Garza v. State, 2 S.W.3d 331 (Tex. App.--San Antonio 1999, pet. ref'd)("same
transaction contextual evidence"). The parties do not argue that possibility in this case. 
In response to Woodard's argument that the trial court erred by failing to give a reasonable
doubt instruction during the punishment phase on the "extraneous offense" of "resisting
arrest," the State contends Woodard must demonstrate egregious harm because he did not
object to the charge or request a reasonable doubt instruction. See Almanza v. State, 686
S.W.2d 157, 171 (Tex. Crim. App. 1984). 

 The standard of review to be applied is controlled by whether an objection was made
to the charge error. Almanza, 686 S.W.2d at 171. When, as here, no objection to the charge
error was made at trial, an appellate court will reverse only if the error caused egregious
harm. Id. "The harm which must be considered is the impact of the omission in the jury
charge of a reasonable-doubt instruction." Ellison v. State, 86 S.W.3d 226, 228 (Tex. Crim.
App. 2002). In assessing the degree of harm, an appellate court must examine the entire jury
charge, the state of the evidence, the arguments of counsel, and any other relevant
information from the record. Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996);
Almanza, 686 S.W.2d at 171. Egregious harm exists if the defendant did not receive a fair
and impartial trial as a result of the omission of the instruction; in this case, we consider
particularly whether the error made the case for punishment clearly and substantially
compelling. See Bluitt, 137 S.W.3d at 53; Hutch, 922 S.W.2d at 171 (citing Almanza, 686
S.W.2d at 172).

 The State did not request the maximum sentence or argue the sentence should be
toward the higher end of the punishment range. Woodard had pled true to the enhancement
allegation of a prior conviction for felony assault on a peace officer, and the State argued the
prior offense should be considered in assessing punishment. See Tex. Code Crim. Proc.
Ann. art. 37.07, § 3(a)(1) (Vernon Supp. 2005). Counsel for the State also emphasized
Woodard's conduct during his arrest and Deputy Hoover's characterization of him and he
stated the jury should consider it when assessing punishment. The trial record does not
reflect inconsistent evidence of Woodard's conduct after the arrest. The Court of Criminal
Appeals has said, "Egregious harm is a difficult standard to prove and such a determination
must be done on a case-by-case basis." Hutch, 922 S.W.2d at 171. In Hutch, the Court
explained that in determining whether egregious harm occurred, a court is to consider
whether the error related to a contested issue, or instead to undisputed, uncontradicted
evidence. Id. at 171-72 (quoting Kucha v. State, 686 S.W.2d 154, 156 (Tex. Crim. App.
1985)). Considering the state of the evidence here, the nature of the offense, Woodard's
prior conviction for another violent felony offense of assault on a peace officer, the
arguments of counsel, and the nature of the asserted charge error, we conclude the omission
of the instruction did not deprive defendant of a fair and impartial trial. See Hutch, 922
S.W.2d at 171 (citing Almanza, 686 S.W.2d at 171). Woodard has not demonstrated
egregious harm from the asserted charge error. See id. The fourth issue is overruled.

Voir Dire


 In his fifth issue, Woodard contends the State did not voir dire the jury concerning
the punishment range he faced if the enhancement for the prior felony assault were used. 
The range of punishment for deadly conduct without enhancement is two to ten years of
confinement and a fine not to exceed $10,000.00, but the enhancement increases the range
of punishment to two to twenty years of confinement and a fine not to exceed $10,000.00.
See Tex. Pen. Code Ann. §§ 12.33, 12.34, 12.42, 22.05(e) (Vernon 2003 and Supp.
2005). Woodard contends he "was harmed because he was sentenced to 15 years
imprisonment, which was 5 years longer than the range for which [the jurors] were
questioned." (1)

 Defense counsel did not object on that basis during the State's voir dire, and defense
counsel set forth the same punishment range in his voir dire as that discussed by the State. 
After voir dire, defense counsel moved to strike the enhancement portion of the indictment
"because the State failed to voir dire the jury on that . . .; [the prosecutor] said the range
of punishment was the third-degree felony from two to ten years." The trial court took the
matter under advisement and allowed counsel one week to provide the court with authority
supporting his argument. The record reflects the trial court did not further address defense
counsel's motion to strike, and defense counsel did not object to this failure. See Tex. R.
App. P. 33.1(a)(2). Woodard argues the lack of voir dire on punishment with enhancement
was fundamental error. However, he cites no authorities in support of this contention. 
Both sides may inform the jury panel of the range of punishment with enhancement. 
Frausto v. State, 642 S.W.2d 506, 509 (Tex. Crim. App. 1982). Woodard cites no
authority suggesting the State must do so. If Woodard wanted the jury to be informed or
questioned, defense counsel could have done so during his own voir dire. See id. 
Woodard's fifth issue is overruled. The judgment of the trial court is affirmed. 

 AFFIRMED. 

 

 DAVID GAULTNEY

 Justice

 

Submitted on May 26, 2005

Opinion Delivered August 10, 2005

Do Not Publish 

 

Before McKeithen, C.J., Gaultney and Kreger, JJ. 
1. Woodard does not contend the jury was improperly charged regarding the punishment
range.