In The


 

Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-04-040 CR


____________________



FREDDIE ALFRED DIXON, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the County Court at Law No. 2


Jefferson County, Texas


Trial Court Cause No. 236036






MEMORANDUM OPINION


 A jury convicted appellant, Freddie Alfred Dixon, of assaulting complainant, a
member of his household. Dixon elected to have the trial court assess his punishment. 
Pursuant to Dixon's agreement with the District Attorney, the trial court sentenced Dixon
to one hundred eighty days in jail probated over one year. Appellant filed this appeal in
which his sole contention is that the evidence was factually insufficient to support his
conviction.

 In Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex. Crim. App. 2004), the Court of
Criminal Appeals phrased the standard for a factual sufficiency review as follows: 

 Considering all of the evidence in a neutral light, was a jury rationally
justified in finding guilt beyond a reasonable doubt? However, there are two
ways in which the evidence may be insufficient. First, when considered by
itself, evidence supporting the verdict may be too weak to support the
finding of guilt beyond a reasonable doubt. Second, there may be both
evidence supporting the verdict and evidence contrary to the verdict. 
Weighing all the evidence under this balancing scale, the contrary evidence
may be strong enough that the beyond-a-reasonable-doubt standard could not
have been met, so the guilty verdict should not stand. This standard
acknowledges that evidence of guilt can "preponderate" in favor of
conviction but still be insufficient to prove the elements of the crime beyond
a reasonable doubt. Stated another way, evidence supporting guilt can
"outweigh" the contrary proof and still be factually insufficient under a
beyond-a-reasonable-doubt standard.


An appellate court "must give due deference to the fact finder's determinations concerning
the weight and credibility of the evidence and will reverse the fact finder's determination
only to arrest the occurrence of a manifest injustice." Swearingen v. State, 101 S.W.3d 89,
97 (Tex. Crim. App. 2003). It is the sole province of the jury to determine the credibility
and demeanor of witnesses and the weight to be given to contradictory testimony. See
Cain v. State, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1981).

 Complainant's mother, L.R., testified she and Dixon were divorced in 1999, but
she, her three children, her grandson, and Dixon were living together when the incident
occurred. L.R. testified that the night of the incident, Dixon came home between 2:00 and
3:00 a.m. Dixon was angry when he arrived because he had heard L.R. had applied for
low-income housing, and he thought L.R. was cheating on him. L.R. testified she saw
Dixon take her car keys, and she could hear him in the garage hammering something. 
Dixon later noticed that her key no longer worked, so she was unable to start her car.

 Dixon and L.R. began to argue. The argument became loud, and complainant,
L.R.'s seventeen-year-old daughter, asked them to be quiet because she and her siblings
had to go to school the next morning. According to L.R., Dixon replied "So what. I have
to go to work the next morning." Complainant said she didn't care that Dixon had to go
to work. Dixon then got up and went to the complainant's bedroom. Using vulgar
language, Dixon told complainant to get out of his house. L.R. said she got up and moved
behind Dixon to make sure nothing would happen because Dixon was already angry and
had asked everyone to get out of his house. L.R. then entered the bedroom. Dixon
continued telling complainant to leave, and complainant refused, so Dixon tried to get
complainant out of bed. According to L.R., complainant then threw a bottle of baby
powder at Dixon. L.R. testified that Dixon grabbed complainant by her hair and pulled
her into another bedroom. L.R. testified that Dixon then began hitting complainant with
his hand. L.R. grabbed Dixon in an attempt to separate the two. L.R. said the fight then
escalated, and Dixon picked L.R. up and threw her out of the way so he could return to
complainant. Dixon was still holding complainant by her hair, and he pushed
complainant's face into the floor while continuing to strike her. Complainant's head hit
the railing on the bed. L.R. said she and her older son attempted to stop Dixon from
attacking complainant. L.R.'s eight-year-old son stood in the doorway crying, begging
everyone to stop. L.R. testified that by the time she was able to get Dixon away from
complainant, her older son had called the police.

 After Dixon released complainant, L.R., her son, and complainant tried to remove
complainant's baby from the bedroom. L.R. said Dixon continued telling everyone to get
out of the house, and she begged him to let them leave. According to L.R., they returned
to the bedroom to get their belongings, and Dixon then came toward L.R.. L.R. stated she
and Dixon began striking each other, and he pinned her against the wall with his hands
around her throat. L.R. said complainant then got two knives from the kitchen, entered
the bedroom, and said "Let my mama go." L.R. stated complainant never cut Dixon with
the knife. L.R. testified that Dixon continued saying "You-all get out." L.R. said Dixon
released her, and complainant then dropped both knives onto the bed and attempted to
leave the room.

 According to L.R., because the hallway door was broken, a pair of scissors had
been placed in the broken hallway door to open it. L.R. said Dixon grabbed the scissors
and continued saying "You-all get out." L.R. stated Dixon might have been pointing the
scissors at her, but she was not certain. L.R. said that, at some point, complainant rolled
over the bed, and complainant and Dixon each had a knife. L.R. indicated that by the time
she and her children were able to leave the house, the police had arrived. L.R. filed a
report and gave a signed, written statement. According to L.R., two officers arrived, and
one officer spoke to her and complainant. The other spoke to Dixon, who was arrested
that night. L.R. identified State's exhibits 1, 2, and 3 as pictures of complainant taken at
eight or nine o'clock a.m., approximately five to six hours after complainant was injured. 
L.R. stated the photographs accurately reflect complainant's appearance after the assault. 
 On cross-examination, L.R. said the statement she provided to the police was brief
because the officers told her that if they wanted to leave, they should get whatever they
could. L.R. further explained "I was trying to get that statement together and get my
children out of the house." L.R. denied being contacted by a detective after the incident,
and stated she had not called the police to inquire about the case. L.R. testified that, when
complainant had a baby at a young age, Dixon gave up his bed because complainant could
not sleep on the couch. L.R. also said Dixon was paying all of the bills, but that she
provided the children with clothing and food by working part-time. When cross-examined
about the pictures of complainant, L.R. stated the photographs clearly show complainant's
face was red and bruised across the forehead. L.R. stated it is strange that, if Dixon
repeatedly struck complainant on the face, the only mark on her face is on her forehead. 
L.R. agreed with Dixon's counsel that, if Dixon had shoved complainant's face into the
floor and pushed her against the wall, she would have injuries other than a knot on her
head. 

 L.R. denied defense counsel's suggestion that complainant came at Dixon with the
knives and Dixon defended himself by pushing her off. L.R. said "I saw him hit her."
L.R. testified that she did not take complainant to the doctor after the incident because
complainant was fine after they applied ice packs to her face. L.R. stated the police took
the scissors, but they did not take the knives. L.R. testified she did not write in her
statement that the complainant had pulled knives because she overlooked it, but stated she
told the officer about it. L.R. denied deliberately omitting the knives from her statement
to keep complainant out of trouble.

 Complainant testified that she was awakened when Dixon came home and began
fussing at her mother. Complainant stated the argument grew louder, so she asked them
to be quiet. According to complainant, Dixon said he had to go to work the next morning,
and she again asked them to be quiet, saying she had to go to school in the morning.
Complainant stated Dixon called her "the 'b' word," and when she called him a name in
return, he charged at her. Complainant said Dixon struck her face several times and
pushed her, and he then pushed complainant's mother. Complainant testified Dixon
grabbed the back of her hair and drug her out of the room while continuing to hit her with
his hand. Complainant stated she tried to tackle Dixon and pushed him against the door,
but he pushed her again, and she hit her head on the metal railing of the bed. Complainant
said Dixon rammed her head into the floor and continued to hit her face. According to
complainant, her mother "jumped in," and Dixon grabbed her mother and struck her a few
times. Complainant said she escaped from Dixon, ran back into the bedroom, locked the
door, and called 911. Complainant said her sixteen-year-old brother also called 911.

 According to complainant, she opened the door after calling 911, and Dixon
charged at her again, so she ran into the kitchen and grabbed two knives. Complainant
then returned to the bedroom, where Dixon had her mother pinned between a dresser and
a chest of drawers. Complainant said she used the knives "to put fear in [Dixon's] heart;
and after a while, it didn't work." Complainant threw the knives onto the bed, and Dixon
charged at her. Complainant stated she and Dixon began fighting again, and he grabbed
one of the knives and she grabbed the other. Complainant said she and Dixon then
exchanged words and began fighting again. Complainant went outside and saw that the
police had arrived. Dixon refused to let her back into the house. According to
complainant, while they were trying to leave, her brother told her Dixon had a pair of
scissors. Complainant stated her nose and gums were bleeding, and she said she had blood
on her shirt. Complainant said the police separated them, asked her to file a report, and
arrested Dixon. Complainant stated she recognized State's exhibits 1, 2, and 3, and she
testified that the photographs were taken the following morning, after she had washed her
nose. According to complainant, the photographs accurately reflect her injuries.
Complainant identified Dixon as the individual who assaulted her. Complainant said her
mother also suffered bruises, but she did not recall whether photographs were taken of her
mother's injuries.

 On cross-examination, complainant stated she sometimes addressed Dixon as
"daddy" because he was her mother's ex-husband. She stated she had lived with Dixon
since she was two years old, and he was more of a father to her than her real father. She
initially denied other incidents of violence in the household, but later testified on cross-examination "This isn't the first time [Dixon] put his hands on me or my mother." 
Complainant stated the bruise on her forehead came either from Dixon striking her or from
her head being hit against something. Complainant testified that Dixon struck her in the
face several times with his fist as well as with an open hand, and he held her by the hair
and shoved her face into the floor. Complainant admitted that in her statement she said
she went to get knives after Dixon had her pinned on the floor, but at trial she said she got
the knives because Dixon was hitting her mother. Complainant attributed the differing
statements to her confusion the night of the incident. Complainant denied recalling where
the knives were when the police officers arrived. 




 Officer Gregory Hubbard of the Beaumont Police Department testified he was
dispatched to Dixon's residence when the incident occurred. Officer Hubbard stated he
saw complainant and her brother coming out the front of the house when he arrived. 
Complainant was bleeding from the mouth and possibly her forehead, and she told him she
had been assaulted by her stepfather. Officer Hubbard said complainant was visibly upset
and crying, and he opined her demeanor was consistent with that of someone who had been
assaulted.

 Officer Hubbard took a pair of scissors that he found in Dixon's right front pocket
as evidence. He also testified complainant told him she had confronted Dixon with two
knives, but he did not recall taking the knives or complainant's clothes into evidence.
According to Officer Hubbard, after he spoke with complainant and L.R., he concluded
complainant had been assaulted, so he arrested Dixon. Officer Hubbard stated the
photographs of complainant accurately reflect her injuries, except that she had blood on
her earlier that morning. Officer Hubbard said the bruise on complainant's forehead in the
photographs was consistent with what he observed.

 On cross-examination, Officer Hubbard stated he recovered the scissors but not the
knives because he was told by complainant that scissors were used in the assault, and the
knives were used as a defensive weapon. Officer Hubbard testified that he arrested Dixon
for aggravated assault with a deadly weapon, and he did not know why the case was
prosecuted as an assault instead of an aggravated assault. Officer Hubbard said he entered
the house, but he did not recall exactly where he went. Officer Hubbard did not recall
whether complainant had blood on her shirt, but he remembered seeing blood on her face.
He indicated in his report that complainant had an abrasion on her top lip. Officer
Hubbard did not recall whether L.R. had any bruises, marks, or scars. He was told at the
scene that Dixon was using the scissors to prevent complainant and her family from
leaving. According to Officer Hubbard, the account he was given regarding the scissors
that night differed from the testimony offered by L.R. and complainant at trial, but he
attributed the discrepancy to the fact that there was a lot of confusion that night. Officer
Hubbard also testified complainant was bleeding from her mouth, while complainant
testified she was bleeding from the nose. He has responded to hundreds of calls since the
night in question, and he cannot recall the specific details of each one. He testified he
relies upon his reports.

 Dixon testified that, on the night of the incident, he had been at a friend's house
playing dominoes, and he drank two beers. He arrived home late. He began arguing with
L.R. about finances because he was paying all the bills, although she was still receiving
child support from him while living in his home. Dixon said the argument became loud
and heated, and L.R. admitted she had applied for housing, so he told L.R. "that is not
right. [You've] got to go. I'm not going to go through this with you again." Dixon stated
L.R. did not leave, and complainant then got up and asked them to be quiet because she
had to go to school in the morning. Dixon exchanged words with complainant. L.R. said
"I'm going to take care of [complainant]," and she went into the complainant's bedroom. 
According to Dixon, his nine-year-old son came and laid with him on the sofa. Dixon
stated complainant and L.R. "got loud back there and she was exchanging words with her
Mama." 

 Dixon said complainant would not be quiet, so he went to the middle bedroom and
said to L.R. "You better get this grown woman a place to stay." Complainant threw
powder at him. Dixon testified that, after complainant threw the powder and hit him on
the shoulder, he became angry, called complainant "the 'B' word," spun around, and
began charging toward complainant. According to Dixon, L.R. grabbed him and stopped
him in the middle bedroom. Dixon stated he and L.R. exchanged words, and they had
their hands on each other. Dixon said complainant ran by, went to the kitchen, got two
knives, and L.R. said "We are leaving now. Just let us get our things. We are leaving." 
Dixon testified that he said "[o]kay" and then asked for whom complainant had gotten
knives. Dixon said he removed the scissors from the hallway closet door to defend
himself. Dixon stated that after he got the scissors, complainant stood in the back
bedroom, and he told L.R. "you need to leave," to which she responded "We're leaving. 
Let us get our stuff." Dixon said complainant then charged out of the back bedroom with
a knife, so he slapped her with his open left hand and she hit the floor.

 On cross-examination, Dixon stated complainant hit her head on the bed railing
when she fell. Dixon said complainant was bleeding from the nose after he slapped her. 
Dixon stated he is right-handed, but he used his left hand to slap complainant because she
was approaching him from the left. According to Dixon, that was the only time he struck
complainant, and he did so because she was charging at him with a knife. Dixon testified
complainant charged at him with two knives. Dixon said L.R. and complainant's brother
pushed him, and he fell down. Dixon testified that, when he got up, complainant had gone
into the room, locked the door, and called 911.

 According to Dixon, when the police arrived, he, not complainant, opened the door. 
Dixon stated the officer was mistaken when he testified he saw complainant walking out
of the house. Dixon testified that complainant exited behind him when he opened the door.
Dixon testified that when the police officer saw complainant bleeding, the officer
handcuffed him, searched him, and took him to the police car. Dixon said he told the
officer he had a pair of scissors in his left back pocket, and the officer took the scissors
from him.

 Dixon denied seeing what happened to the knives, but stated he saw them lying on
the bed when he went home after being released from jail. Dixon stated he did not
remember police officers going into the house at all, but the police could have taken the
knives if they had wanted to do so. On cross-examination, Dixon initially said the officer
stayed with him half the time and did not enter the house, but then admitted it was possible
that the officer did enter the house, since Dixon did not have a good view of the house. 

 It is the exclusive province of the jury to assess the credibility of the witnesses and
the weight to be given contradictory testimony, as well as to resolve any conflicts or
inconsistencies in the evidence. See Cain v. State, 958 S.W.2d 404, 408-09
(Tex.Crim.App.1997); Penagraph, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981); see
also Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979). Considering all of the
evidence in a neutral light, the jury was rationally justified in finding proof of guilt of
assault beyond a reasonable doubt. See Tex. Penal Code Ann. § 22.01 (a) (Vernon
Supp. 2005). The evidence supporting the verdict, including the direct testimony of L.R.,
the complainant, and Officer Hubbard, is not too weak to support the verdict, nor is the
contrary evidence, including the direct testimony of Dixon, so strong that the burden of
proof could not be met. Dixon admits he struck complainant, though he says she was
attacking him. The jury was not required to accept his explanation as credible. The
evidence is factually sufficient to support the verdict. Dixon's sole issue is overruled, and
the judgment of the trial court is affirmed.


 AFFIRMED. 

 

 DAVID GAULTNEY

 Justice


Submitted on March 3, 2005

Opinion Delivered April 20, 2005

Do Not Publish


Before Gaultney, Kreger, and Horton, JJ.