Jessie JONES III, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–00–042 CR.

Court of Appeals of Texas, Beaumont.

Submitted Feb. 22, 2001.

Decided Feb. 28, 2001.

Douglas M. Barlow, Beaumont, for appellant.

Tom Maness, Criminal District Attorney, Rodney D. Conerly, Assistant Criminal District Attorney, Beaumont, for state.

Before WALKER, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

WALKER, Chief Justice.

A jury found Jessie Jones III to be guilty of attempted capital murder. The trial court assessed punishment at confinement in the Texas Department of Criminal Justice, Institutional Division, for a term of seventy-five years. The sole point of error raises the issue of ineffective assistance of counsel.

To prevail on an ineffective assistance of counsel claim, the appellant must establish that (1) counsel's performance fell below the standards of reasonable competency, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hernandez v. State*, 988 S.W.2d 770 (Tex.Crim.App. 1999). "This two-pronged test is the benchmark for judging whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a reliable result." *Thompson v. State*, 9 S.W.3d 808, 812–13 (Tex.Crim. App.1999). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *McFarland v. State*, 928 S.W.2d 482, 500 (Tex.Crim.App.1996).

■■■ "Any allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* The appellant must overcome the strong presumption that counsel's actions fall within the wide range of reasonable professional assistance by identifying the acts or omissions of counsel that are alleged to have constituted the ineffective assistance and then affirmatively proving that they fell below the professional norm for reasonableness. *See Strickland*, 466 U.S. at 689–90, 104 S.Ct. 2052. In the absence of an evidentiary hearing in which counsel is

called upon to explain his actions, we must presume that, under the circumstances, the challenged action might be simply considered to be part of an overall strategic plan. *See Tong v. State*, 25 S.W.3d 707, 713–14 (Tex.Crim.App.2000); *Thompson*, 9 S.W.3d at 813–14. The appellant may meet the burden of overcoming the presumption where an objective review of the record reflects that counsel's omission would have been unacceptable regardless of any trial strategy. *Thompson*, 9 S.W.3d at 815–16 (Meyers, J. dissenting) (citing *Vasquez v. State*, 830 S.W.2d 948, 950 (Tex. Crim.App.1992)).

The indictment alleged that Jones, with the specific intent to commit capital murder, did intentionally attempt to cause the death of Arthur Woods by cutting and stabbing Woods with a deadly weapon, a knife, while in the course of committing or attempting to commit robbery. Woods testified that he was personally acquainted with Allan Joseph Coleman, whom Woods knew as "Pete." Coleman is Jones's brother-in-law. Woods had never met Jones before the day of the offense, when Jones and Coleman entered Woods's home on the pretense of buying a $5.00 bottle of gin and using the restroom. Coleman pointed a .380 at Woods's head and screamed, "Bitch, it's time to break bread," a phrase meaning that Woods must either give up his money or be killed. Jones rushed forward and started punching Woods in the face. Woods directed his assailants to $750 in cash hidden under the kitchen sink. Woods was knocked to the floor and hog-tied with an extension cord. Jones and Coleman went through Woods's pocket, removing a pocket knife and a gun. While Coleman searched for more money, Jones took Woods's pocket knife and repeatedly stabbed Woods in the back of the neck. Coleman stated that they would have to kill Woods. Someone kicked Woods; then Coleman sprayed mace in his eyes. Coleman got gasoline and kerosene from under the sink, poured it over Woods, and stated, "Let's set him on fire." Jones went to one of the kitchen drawers, took out a steak knife, and stated, "I'll bet this is really going to hurt." Woods begged Jones not to cut him any more. Jones sliced Woods on the upper leg, hit him a few times on the back with the knife, cut him twice on the back of the neck, then tried to hold Woods's head up in order to cut Woods's throat. Jones took boiling water from the microwave oven and slowly poured it over Woods. Jones went to another room and ransacked the house. Coleman stated, "Jessie, Jessie, we got to kill him. Jessie, we got to kill him." Jones stabbed Woods again. Then Coleman stated, "Art, see ya," and, using Woods's .22 caliber revolver, shot Woods at point blank range in the upper side, the back, and the side of the head. Approximately 45 minutes had elapsed. Woods survived to repeatedly provide in-court identification of the defendant.

Aline Faye Handy White provided an alibi for Jones. The maternal grandmother of Jones's children, Handy testified that she was visiting her daughter and newborn grandchild when she saw a news report of the assault on Woods. Jones, who was present in the house at that moment, did not react unusually to the report. Once it was established through cross-examination that the news report probably occurred the day after the assault, White testified that Jones had been at the house the night before and had been at the house "pretty well constantly" since the birth of his child. There were no significant times when Jones was away from the residence. White explained that she did not report the alibi because her daughter delayed in informing her about Jones's legal troubles.

In addition to the testimony offered in support of his alibi, Jones developed a theory that attempted to undermine the victim's apparently rock-solid in-court identification of Jones as one of the two assailants. On direct examination, Woods testified that he recognized Jones's "beady eyes," then stated, "He had gold in his mouth, too." This augured well for the

defense, for it seems Jones was not wearing gold fronts on the day of trial. Defense counsel explored the issue of golden teeth at length throughout the trial.

Defense counsel developed a theory that Woods accused Jones not because he could identify him, but because friends sent into the neighborhood to find Coleman came up with the name Jessie Jones. Woods claimed he told the investigating detective that Coleman called his companion "Jessie." On appeal, Jones claims defense counsel was ineffective because he caused the probable cause affidavit to be admitted into evidence. This was clearly part of a trial strategy, as the affidavit shows that the name "Jessie Jones" did not appear in the investigation until ten days after Detective Sheffield interviewed the victim. Under the defense theory presented at trial, Woods fabricated the part about Coleman calling his companion "Jessie" in order to shore up Woods's mistaken impression that Jones was the assailant.

■ On appeal, Jones complains that his trial counsel undermined his alibi defense by calling Coleman as a defense witness. Coleman had already pleaded guilty and admitted to having committed the offense. Coleman testified that he and Jones committed the offense together. Defense counsel developed a theory that Coleman and an unidentified person with gold teeth actually committed the offense, but Coleman implicated Jones after learning that the person Coleman originally implicated had died before the date of the offense. Defense counsel developed that Coleman only implicated Jones after Jones's father refused to bond out Coleman. Coleman testified that he usually calls Jones "Trey," not "Jessie," thus undermining Woods's claim that Coleman called his companion by name.

The elder Jones testified that three or four days after the incident, the police came looking for Coleman, not Jones. Jones was present at his house at the time, but the police did not ask about him. Although this line of questioning weakened White's testimony that Jones spent days at her daughter's home caring for a new baby, it supported the defense theory that Jones was the victim of a frame-up that developed after Coleman was apprehended and Woods learned from friends that Coleman associated with Jones. Although Jones complains on appeal that trial counsel failed to object to Detective Sheffield's testimony that the street gang unit developed Jones as a suspect based on street talk, that testimony played into the defense's misidentification theory.

Jones also complains that defense counsel was ineffective for offering his otherwise inadmissible extraneous bad acts into evidence, and for opening the door to further evidence of bad acts by eliciting an open-ended response that Jones had not had any problems since he had been on probation. Jones testified that he was serving a deferred adjudication community supervision for unauthorized use of a motor vehicle, and that a motion to revoke that probation was pending as a result of the accusation for which he was on trial. He also admitted to having received a trespass warning at his girlfriend's housing project, but testified that he went anyway to see his family and take clothing to his new baby. We view with trepidation any strategy in which the defendant admits to having committed criminal conduct which the State would not be permitted to elicit on cross-examination, but it is apparent that Jones was trying to evoke the sympathy of the jury by showing the collateral consequences of a case of mistaken identity. Jones's candor was characterized in defense counsel's jury argument as an attempt to convince the jury of defendant's credibility.

We hold that Jones failed to overcome the presumption that trial counsel's actions were part of a reasonable, albeit unsuccessful, trial strategy. Furthermore, Jones fails to establish the prejudice prong of *Strickland*. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Given the overwhelming evidence of guilt, we cannot say that,

but for counsel's errors, the jury would have had a reasonable doubt respecting guilt. *See McFarland,* 928 S.W.2d at 500. Assuming *arguendo* that counsel's strategy was so implausible as to fall below the level of competent professional assistance, we cannot conclude that counsel entirely failed to subject the prosecution's case to meaningful adversarial testing. *See United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The ultimate failure of the defense's strategy appears to be attributable to the facts the witnesses related to the jury, rather than to counsel's inept examination. Issue one is overruled.

The judgment of the trial court is affirmed.

AFFIRMED.