NUMBER 13-02-423-CR

 

                         COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI - EDINBURG 

 

LUIS MUNIZ, JR.,                                                                             Appellant,

 

                                                             v.

 

THE
STATE OF TEXAS,                                                                  Appellee.

 

      On appeal
from the 214th District Court of Nueces County, Texas.

 

 

                               MEMORANDUM
OPINION

 

                       Before
Justices Hinojosa, Yañez, and Castillo

                            Memorandum
Opinion by Justice Yañez

 








Appellant, Luis Muniz, Jr., was indicted and tried
for the murder of Priscilla Cantu.  A
jury found him guilty of the lesser-included offense of manslaughter[1]
and assessed his punishment at ten years= imprisonment. 
In four issues, appellant challenges his conviction, alleging:  (1) the evidence is legally and factually
insufficient to support the jury=s rejection of his self-defense claim; and (2) his
trial counsel rendered ineffective assistance. 
We affirm. 

The record contains the trial court=s certification that this Ais not a plea-bargain case, and the defendant has
the right of appeal.@[2]

                                                                  Background


Shortly after 1:00 a.m. on June 23, 2001, Priscilla
Cantu called  911 and reported that she
had been stabbed.[3]  The police arrived approximately five minutes
later and found Cantu lying in a pool of blood in the hallway of a residence
she shared with her boyfriend, Eugene Hernandez (a Corpus Christi police
officer), and appellant, Hernandez=s half-brother. 
Although Cantu was still alive when the police arrived, she was unable
to speak and died shortly thereafter.

The first two police officers to arrive at the
scene, Officers Jason Le and Karl Wright, testified at trial that when they
entered the house, they heard appellant yelling incomprehensibly in an angry
tone of voice.  As the officers entered,
appellant emerged  from one of the
bedrooms and upon seeing the officers, threw up his hands and said, AI did it.  I
did it.@  Appellant
was handcuffed and taken into custody. 
As Officer Wright escorted him to the police car, appellant voluntarily
said he had done it because A[Cantu] was trying to take over the house.@[4]  Wright also
testified that appellant said Cantu was going to get a gun and that he had
stabbed her in self-defense.  








Appellant moved in with Hernandez in June 1998.  In addition to his work as a police officer,
Hernandez owned a Ahot shot@ service business, which involves delivery of
machine parts to oil rigs on an as-needed expedited basis.  The nature of the business is to be Aon call@ or available 24 hours a day, seven days a week, for
deliveries.  Appellant worked for Hernandez
in the business.  

In November 2000, approximately eight months before
the fatal incident, Cantu moved into the residence to live with Hernandez.  Hernandez testified that he and Cantu had
planned a Caribbean trip in September and that they had discussed marriage
plans  earlier in the evening on the
night she was killed.








Hernandez testified that on June 22, 2001, he and
Cantu had pizza together at the house around 5:30 p.m.  He told her he had plans to attend a bachelor
party for a colleague.  Cantu planned to
go bowling with friends.  Both left the
house about 8:30 p.m. Appellant had gone to work around 10:00 a.m. and had not
returned when Cantu arrived home from bowling around 1:00 a.m.  Appellant testified Cantu was already home
when he arrived at the residence sometime shortly before 1:00 a.m.  Appellant testified Cantu demanded to know
where Hernandez was and became angry when appellant said he did not know.  Appellant testified Cantu followed him into
his bedroom, hit him on the head, and threatened to kill him.  According to appellant, Cantu then went into
the master bedroom, where several handguns were kept.  Appellant testified he tried to leave the
house, but Cantu caught up with him and hit him on the nose with a black object
he believed to be a gun.  According to
appellant, he tried to push Cantu away, but she backed him up against the front
door.  He testified he pulled out his
knife and stabbed her because he felt he had Ano
choice.@  The primary
issue at trial was whether appellant acted in self-defense when he stabbed
Cantu.  

Appellant=s claim of ineffective assistance concerns his
counsel=s failure to object to the admission of a tape
recording of a voice mail message that appellant left on Hernandez=s cell phone in mid-March 2002 (approximately two
months before trial).[5]  The tape was admitted into evidence with no
objection from appellant=s counsel and was played for the jury.  The voice mail message stated as follows:

This is your little brother, Gino.  I wanted to talk to you and I=m hoping I can talk to you.  You can, but you ain=t got no balls, mother fucker.  You=re just a piece of shit.  Do you want to meet me somewhere?  Meet me at a mutual site and I=ll whoop your ass any time of the fucking night, day
or night.  You=re just a crooked cop.  I=ll be more than glad to take your life, dude.[6]  Fuck you, mother fucker.

 

The
tape and a transcript of the tape were admitted into evidence.

   

                                                    Sufficiency
of the Evidence








In his first two issues, appellant contends the
evidence is legally and factually insufficient to support the jury=s rejection of his self-defense claim.  In support of his argument, appellant relies
on his own testimony that Cantu physically attacked him and threatened to shoot
him.  According to appellant, Cantu hit
him on the nose with an object he believed to be a gun.  Appellant testified that he was forced to
stab Cantu to protect himself from being shot. 


In reviewing a challenge to the legal sufficiency of
the evidence to support the rejection of a self‑defense claim, we view
the evidence in the light most favorable to the prosecution to determine if any
rational trier of fact would have found beyond a reasonable doubt the essential
elements of the offense and against the appellant's self‑defense claim.[7]  In reviewing a challenge to the factual
sufficiency of the evidence to support the rejection of self‑defense, we
review all the evidence in a neutral light and ask whether the State's evidence
taken alone is too weak to support the finding of guilt beyond a reasonable
doubt and whether the evidence supporting the defense is strong enough that the
rejection of the claim does not meet the beyond‑the‑reasonable
doubt standard.[8]  In conducting these reviews, we bear in mind
that the fact finder may draw reasonable inferences, is the sole judge of the
weight of the evidence and credibility of the witnesses, and may accept or
reject any or all of the evidence produced by the parties.[9]


                                                                Applicable
Law








Under Texas law, a person commits the offense of
manslaughter if he recklessly causes the death of an individual.[10]  A person acts recklessly, or is reckless,
with respect to circumstances surrounding his conduct or the result of his
conduct when he is aware of but consciously disregards a substantial and
unjustifiable risk that the circumstances exist or the result will occur.[11]  Culpable mental state is generally proven
through circumstantial evidence.[12]

Self defense serves as a justification excluding
criminal responsibility for otherwise criminal behavior.[13]  A person is justified in using deadly force
against another when and to the degree he reasonably believes the force is
immediately necessary to protect himself against the other's use or attempted
use of unlawful force, if a reasonable person in the actor's situation would
not have retreated, and when and to the degree that he reasonably believes the
deadly force is immediately necessary to protect himself against the other's
use or attempted use of unlawful deadly force, or to prevent the other's imminent
commission of aggravated kidnapping, murder, sexual assault, aggravated sexual
assault, robbery, or aggravated robbery.[14]


Here, the record contains conflicting evidence
regarding the circumstances and events surrounding Cantu=s death.  We
turn to a discussion of testimony and evidence pertinent to appellant=s claim of self-defense.

Appellant=s Testimony








Appellant testified that although Hernandez had
allowed Cantu to move in with him, he (Hernandez) did not really want her there
and had asked her to move out several times. 
Shortly after Cantu moved in and several times thereafter, Cantu had
suggested to appellant that it was time for him to Amove on.@  During the
eight months Cantu lived in the house, she and appellant had several arguments,
generally over whether appellant should move out.

After Cantu moved in, Hernandez continued to see
other women.  When Cantu would learn of
these relationships, she would Aget mad and go on a rampage.@  On several
occasions, she told appellant she was going to get a gun and kill
Hernandez.  On one occasion, she showed
up at a club where Hernandez was dancing with friends and  slapped him in the face.  Appellant testified he saw Cantu hit
Hernandez Anumerous times.@  According to
appellant, Hernandez planned to end his relationship with Cantu upon returning
from the trip they had planned for September. 
Appellant knew Hernandez kept several handguns in the master bedroom,
including one kept under the mattress.  

On June 22, 2001, appellant left the house around
10:30 a.m. for work.  He spent the day at
the trucking yard talking to other drivers and working on the truck because
there were no Aruns@ assigned to him. 
He left around 5:30 p.m. and went to visit a friend.  After spending an hour at his friend=s house, appellant drove to the 60-acre ranch owned
by Hernandez in Duval County.  Appellant
filled the deer feeders and left the ranch about 9:30 p.m.  He stopped in Alice to eat and paged his girlfriend
to make plans for later in the evening. 
He stopped back by his friend=s house and drank a beer.  Appellant=s
girlfriend called and said she planned to come to appellant=s house and spend the night with him.  Appellant arrived at the house just before
1:00 a.m.              








Appellant entered the house through the front door
and walked through the living room toward his bedroom.  Cantu was sitting at the bar in the living
room.  Cantu asked him where Hernandez
was.  When appellant said he did not
know, Cantu became angry and accused him of Acovering
up for [Hernandez] again.@  Appellant
ignored her and she hit him on the back of the head, knocking off his baseball
cap.  Cantu followed appellant into his
bedroom and demanded to know where Hernandez was.  She also asked appellant to hand over the
cell phone appellant carried because it contained phone numbers of Hernandez=s other girlfriends. 
Hernandez had told appellant not to ever let Cantu have the phone
because she would find the numbers. 
Cantu reached for the phone, which was clipped inside appellant=s pants pocket. 
Appellant blocked her from getting the phone, which further enraged
her.  Cantu said, A[w]hen your brother gets home, I=m gonna kill his fucking ass.@  Appellant
asked her to leave the room a second time, but Cantu said she wasn=t afraid and Awas gonna get her gun and shoot [appellant=s] fucking ass.@ 

Cantu left appellant=s
bedroom.  Appellant knew Cantu had a
handgun in the master bedroom and that she knew how to use it.  When Cantu went toward the master bedroom,
appellant decided to leave and headed for the front door.  Before he reached the door, Cantu ran toward
him and as appellant turned around, Cantu hit him on the bridge of his nose
with a Ablack object@ that he believed was a gun.  Appellant testified Cantu kept Acoming at@ him and continued to scratch him.  He tried to push her away, but did not ever Amake a fist@ at her.  With
his back against the door, appellant pulled his knife out and remembers
stabbing Cantu once[15]
because he Ahad no choice.@  













Appellant testified that after he stabbed Cantu, she
went into the master bedroom to get a cordless phone.  Appellant went into his bedroom and threw the
knife under his mattress.  He then went
to the bathroom to get a towel to apply to Cantu=s
wounds.  He met her in the hallway and
she was on the telephone asking for help. 
Cantu handed the phone to appellant. 
He mistakenly assumed it was Hernandez on the phone and said, AGene, you need to come home.  Something happened.  I got into a fight with your girlfriend and I
stabbed her.@[16]  Appellant
then realized he was speaking with the 911 dispatcher.  He told the dispatcher to hurry up and hung
up the phone.  Appellant rinsed the towel
out and again applied it to Cantu=s wounds. 
Appellant went into his bedroom and used the phone in his bedroom to
call 911 and request an ambulance.  He
also opened the garage door to allow quicker access to the house for the
emergency medical personnel.             

Appellant testified that he is five feet, nine
inches tall. Appellant said he was Asurprised@ by the fact that his booking sheet shows he weighed
180 pounds at the time of his arrest.[17]  








On cross-examination, appellant admitted that he
never was able to identify the Ablack object.@  Appellant
testified that when he headed toward the front door, he was not running, but
was walking as fast as he could. 
Appellant suffered scratch marks on the left side of his face, a blow to
his nose, and scratch marks on his right arm and under his neck.  During the scuffle, appellant was able to
reach into his pants pocket, pull out his knife, and flip it open with one
hand.  He was able to perform this
maneuver without dislodging his cell phone, which was in the same pocket as the
knife. 

With regard to the statements he made to the
investigating officers, he does not remember saying AI did it.  I
did it,@ when the officers first entered the house.  He admits he may have said, AI did it because she=s
trying to take over the house.@  Appellant
also admits he may have told Officer Wright, AYeah,
it was self-defense.  She [Cantu] was mad
that I brought my brother=s truck home late.@  He also admitted that he may have told the
officers that he and Cantu began to fight, she said she was going to get a gun,
and that=s when he stabbed her.  Appellant admitted that at one point, he may
have walked into the master bedroom and Amay have walked a little bit back and forth.@[18] 

With regard to the tape of appellant=s voice mail message to Hernandez, appellant  testified he had been drinking when he made
the call.  Appellant admitted he Amay have said some words in anger,@ but denied that it was a threatening tape.  

Gene Hernandez  








Hernandez testified that Cantu had no objection to
him going to a bachelor party and later, to a club on the evening of June 22,
2001.  Although Hernandez took his cell
phone with him that evening, he left it in his truck.  He did, however, have his pager with him the
entire evening.  Hernandez said he
received a call from Cantu about 8:45 p.m., which was the last time he spoke
with her.  He told her to call when she
was on her way home and he would meet her at home.  He received a page at 2:30 a.m., but does not
know the identity of the caller. 
Hernandez admitted he and Cantu argued occasionally, but said such
fights were never physical.  He admitted
that Cantu once pulled the handgun he keeps in his holster on him; he denied,
however, that she had ever threatened him with a gun.

Although usually there were no loaded handguns in
the house, on the evening of  June 22,
2001, there were two: (1) Hernandez=s off-duty weapon, usually kept in his truck, was
left on top of the dresser with a T-shirt covering it; and (2) Hernandez=s service weapon strapped inside his holster, was
left on the floor of the master bedroom closet. 
Hernandez denied that he ever kept a handgun under the mattress.

Hernandez was aware that appellant and Cantu argued
on occasion, usually over appellant=s failure to put food away properly.  Hernandez was unaware Cantu had ever asked
appellant to move out of the house.     

Hernandez testified that he and Cantu had discussed
that if they got married, appellant would move out of the house.  Hernandez had not discussed the matter with
appellant, but admitted that Cantu might have. 


  Hernandez
testified his sisters were attempting to portray Cantu as some Acrazy woman@ in an effort to protect appellant.  

Erica Garcia








Garcia, a friend of Cantu=s, testified that she and Cantu were bowling with a
church youth group the evening of June 22, 2001.  Garcia said Cantu was in an upbeat mood.  Cantu told Garcia that Hernandez was at a
bachelor party and that she had encouraged him to go because she was looking
forward to attending an upcoming bachelorette party.  Garcia and Cantu left the bowling alley and
walked out to the parking lot together at 1:00 a.m.  Garcia testified that just before Cantu left
the bowling alley, she was Ain a good mood@ and exhibited no signs of being angry or
jealous.    

John Preble 

Preble, a crime scene technician with the Corpus
Christi police department, testified that he found evidence indicating that a
struggle occurred in the area near the front door, including Cantu=s broken watch, appellant=s gold rope chain necklace and pendant, one of Cantu=s broken fingernails, and blood spatter.  Investigators collected three handguns from
the master bedroom, but none of the weapons indicated they had been disturbed
and none had any blood on or near them. 
The blood trail in the master bedroom was consistent with a person
reaching across the bed to reach the telephone. 
Preble testified that the blood tracked into the master bedroom
reflected two different sets of prints in close proximity to each other in the
bedroom.  

Jason Le 

Le, one of the first two officers on the scene,
testified that after taking appellant into custody, they checked the house for
weapons.  None of the guns in the house
appeared to have been disturbed.  No
weapon was found in Cantu=s hands or in any area near her.  Le testified that when they arrived,
appellant was not helping the victim and did not have blood on his clothing
consistent with his claim that he had been trying to help the victim. 

Hugo Stemmler 








Stemmler, a detective in the Criminal Investigative
Division of the Corpus Christi police department, testified that the knife
recovered from under the mattress in appellant=s
bedroom was a deadly weapon capable of causing serious bodily injury or
death.  

Lloyd White  

White, the medical examiner who performed the
autopsy on Cantu, testified that she  had
suffered four stab wounds, one of which penetrated her heart and caused her
death.  He testified that after Cantu
suffered the fatal wound, she likely lost consciousness and collapsed a minute
or so later.  He also testified that the
knife found under appellant=s mattress was capable of causing serious bodily
injury or death.   

Trina Smith 

Smith, one of Hernandez=s ex-wives, testified that Cantu was very possessive
and jealous.  

Christina Hernandez 

Christina Hernandez, Hernandez=s half-sister, testified that Hernandez told her he
would lie to protect Cantu=s name.  

Cayetana (Kelly) Muniz

Muniz, appellant=s
full-blooded sister and Hernandez=s half-sister, testified that Hernandez did not want
Cantu to move in with him.  She testified
Hernandez planned to tell Cantu that he wanted out of the relationship when
they returned from their planned September trip.  According to Muniz, Hernandez told her he was
always fighting with Cantu because she was very jealous.  According to Muniz, shortly before Cantu was
killed, Hernandez offered to pay a deposit and a month=s rent if Cantu would move out and get her own
place.     








By returning a verdict of guilty, the jury
necessarily resolved the conflicts between the evidence supporting guilt and
the evidence undermining guilt in favor of the State.  As the sole judge of the witnesses= credibility and weight to give the testimony, the
jury was free to do that, and we will not disturb that finding.[19]  Viewing the evidence under the appropriate
standards, we conclude the evidence was legally and factually sufficient to
support the jury=s rejection of appellant=s claim of self-defense.  Appellant admitted he was unable to identify
the Ablack object@ that he believed to be a gun.  No weapons (or Ablack
objects@) were found in Cantu=s
hands or near her body.  We hold the
evidence was legally and factually sufficient to support the jury=s finding beyond a reasonable doubt that appellant
recklessly caused Cantu=s death.[20]  We overrule appellant=s first and second issues. 

                                               Ineffective
Assistance of Counsel

In his third and fourth issues, appellant contends
he was denied effective assistance of counsel as guaranteed by the state and
federal constitutions.  Specifically,
appellant contends his counsel was ineffective because counsel failed to object
to or request a limiting instruction regarding the taped voice mail message appellant
left on Hernandez=s cell phone. 
Appellant argues that the voice mail message was an extraneous act and
that counsel Ainexplicably@ failed to object to its admissibility or request a
limiting instruction.  

                                                            Standard
of Review  








We review ineffective assistance claims under the
two-part test set forth in Strickland v. Washington, 466 U.S. 668, 687
(1984), and Bone v. State, 77 S.W.3d 828, 832 (Tex. Crim. App.
2002).  The test requires appellant to
show that (1) counsel=s performance fell below an objective standard of
reasonableness under prevailing norms, and (2) there is a reasonable
probability that, but for counsel=s deficient performance, the result would have been
different.[21]  AThis two pronged test is the benchmark for judging
whether counsel=s conduct so undermined the proper functioning of
the adversarial process that the trial cannot be relied on as having produced a
reliable result.@[22]  








There is a strong presumption that counsel=s conduct fell within the wide range of reasonable
professional assistance.[23]  To defeat the presumption of reasonable
professional assistance, Aany allegation of ineffectiveness must be firmly
founded in the record, and the record must affirmatively demonstrate the
alleged ineffectiveness.@[24]  In most
cases, a silent record that provides no explanation for counsel=s actions will not overcome the strong presumption
of reasonable assistance.[25]  The fact that another attorney might have
pursued a different course of action at trial will not support a finding of
ineffectiveness.[26]  When the record is silent as to possible
trial strategies employed by defense counsel, we will not speculate on the
reasons for those strategies.[27]  Appellant bears the burden of proving
ineffective assistance by a preponderance of the evidence.[28]

                                                                      Analysis  

Appellant complains his trial counsel was
ineffective by (1) failing to object to the admission of the taped voice mail
message, and (2) failing to request an instruction limiting the jury=s consideration of the extraneous act evidence.   

To prevail on a claim of ineffectiveness based on
counsel=s failure to object to the admission of evidence, an
appellant must show that the evidence he failed to object to would not have
been admitted if a proper challenge had been raised at trial.[29]  Here, appellant contends his counsel should
have objected to evidence that appellant threatened to kill Hernandez two
months before trial.  Evidence of threats
or coercion of the accused towards a witness is admissible to show the accused=s consciousness of guilt.[30]  We conclude there was no ineffective
assistance for failure to object by trial counsel to the admission of appellant=s  taped voice
mail message.

Appellant also contends his counsel was ineffective
for failing to request an instruction limiting the jury=s consideration of the taped voice mail
message.  








The failure to request a limiting instruction is
not, by itself, ineffective assistance of counsel.[31]  Failure to request such an instruction has
been recognized as reasonable trial strategy under certain circumstances.[32]

In the present case, the State introduced the tape
during its questioning of Hernandez.  The
State then elicited testimony from Hernandez that appellant=s voice on the voice mail message sounded like
appellant was intoxicated.  The State=s questioning emphasized that on the 911 tape,
appellant sounded significantly less intoxicated than  he did on the voice mail message.

On cross-examination of Hernandez, appellant=s counsel questioned Hernandez about events that may
have Aprecipitated@ the call from appellant.  Specifically, counsel elicited testimony from
Hernandez that prior to appellant=s call, his sister Christina called  him Aat least seven or eight times.@  Eventually,
Hernandez stopped answering her calls. 
Counsel=s line of questioning elicited testimony that
Christina tried to convince Hernandez to testify truthfully concerning the
violent nature of his relationship with Cantu. 
With regard to her phone conversation with Hernandez, Christina
testified that Hernandez told her he was willing to lie to protect Cantu=s name, even if it meant appellant would be sent to
prison and even if it meant he (Hernandez) would be sent to prison.      








We conclude appellant=s
counsel=s failure  to
request an instruction limiting the jury=s consideration of the taped voice mail message may
have been reasonable trial strategy.[33]  We hold appellant has Afailed to overcome the presumption that trial
counsel=s actions were part of a reasonable, albeit
unsuccessful, trial strategy.@[34]  We further
note that appellant has not shown that any such objections or limiting
instructions would have resulted in a different outcome at trial.[35]  We overrule appellant=s third and fourth issues.  

We affirm the trial court=s judgment.  

 

                                                               
                                                       

     LINDA
REYNA YAÑEZ

     Justice

 

 

 

 

Do
not publish.  Tex. R. App. P. 47.2(b).

 

Memorandum
opinion delivered and filed 

this
the 29th day of September, 2005.











[1]
See Tex. Pen.
Code Ann. ' 19.04(a) (Vernon 2003). 





[2]  See Tex. R.
App. P. 25.2(a)(2).





[3]
Lani Trotter, police dispatch
coordinator, testified that emergency records show  two 911 calls were made from the residence,
one at 1:06 a.m., and a second, made from a separate line at the residence, at
1:10 a.m.  





[4]
Appellant testified that he Amay have said that at one point or
another.@





[5]
Following appellant=s arrest, he was in jail for
approximately ten weeks.  Thereafter, he
was released on bond and went to live with his sister, Christina, in San
Antonio.  According to appellant, in
early March 2002, Christina told him about a recent phone conversation she had
with Hernandez, in which Hernandez  told
her that Ahe was willing to perjure himself
and lie even if he [Hernandez] had to go to prison.@ 
Christina also told appellant that Hernandez had threatened appellant,
saying if he met appellant in prison, he was going to kill him.  The voice mail message from appellant to
Hernandez is apparently a response to these events.    





[6]
The audiotape is difficult to
understand.  Appellant testified that he
used the term Adude@ on the tape.  On redirect examination of Hernandez by the
State, appellant=s counsel introduced (as Defense
Exhibit #14) a transcript of the voice mail tape.  The State then elicited testimony from
Hernandez that he believed that the word was not Adude,@ but was Atoo.@ 
Hernandez testified he had never heard appellant use the word Adude.@ 
We have listened to the tape. We conclude, however, that we need not
determine this issue to resolve appellant=s issues on appeal.  See
Tex. R. App. P. 47.1.





[7]
Saxton v. State, 804 S.W.2d 910, 914 (Tex. Crim.
App. 1991).  





[8]
See Zuniga v. State, 144 S.W.3d 477, 484‑85
(Tex. Crim. App. 2004); Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim.
App. 2003). 





[9]
Swearingen v. State, 101 S.W.3d 89, 97 (Tex. Crim.
App. 2003); Johnson v. State, 959 S.W.2d 284, 287 (Tex. App.BDallas 1997, pet. ref'd). 





[10] Tex. Pen.
Code Ann. ' 19.04(a) (Vernon 2003). 





[11]
Tex.
Pen. Code Ann. ' 6.03(c) (Vernon 2003). 





[12]
See Dillon v. State, 574 S.W.2d 92, 94 (Tex. Crim.
App. [Panel Op.] 1978).





[13]
Tex.
Pen. Code Ann. ' 9.31 (Vernon 2003). 





[14]
Tex.
Pen. Code Ann. ' 9.32(a) (Vernon 2003).





[15]
The medical examiner
testified that Cantu suffered four stab wounds, one of which was fatal.  





[16]
The tape of Cantu=s 911 call was played to the
jury.  The transcript of the call
reflects the following:

 

[Cantu]: Hurry.  There=s blood all down my leg. 
I=m gonna pass out.  Hurry.

 

[Dispatcher]: We=re on our way, ma=am.

 

[Cantu]: Oh, my God.

 

[Dispatcher]: Who stabbed you, ma=am?

 

[Cantu]: Uhm.  Just come, please.

 

[Dispatcher]: We=re coming, ma=am. 
But who stabbed you?  Your
boyfriend?

 

[Cantu]: I don=t know.  I don=t know.  Hurry.

 

[Dispatcher]: What=s your name?

 

[Cantu]: Oh, my God.

 

[Dispatcher]: We got somebody
going, ma=am. 
What=s your name?

 

[Cantu]: Priscilla Cantu.

 

[Dispatcher]: Priscilla Cantu?

 

[Cantu]: Yes.  Oh, Luis, please.  Luis.

 

[Dispatcher]: Hello.

 

[Appellant]: Hey.

 

[Dispatcher]: What=s going on, sir?

 

[Appellant]: Big Gino.  Ven paca, carnal.  

 

[Dispatcher]: What happened, sir?

 

[Appellant]: Yo tengo pedo.  Te punate tu raca, vato.  Ven paca de volada horita, vato.

 

[Dispatcher]: Hello, sir.

 

[Appellant]: Hello.

 

[Dispatcher]: Que paso?

 

[Appellant]: Gene.

 

[Dispatcher]: This is the police
department.

 

[Appellant]: I need Gino=s number right now.

 

[Dispatcher]: What=s going on, sir?

 

[Appellant]: It=s an emergency right now.

 

[Dispatcher]: Did your wife got [sic]
stabbed?  Who stabbed her?

 

[Appellant]: Nobody.  Just come over here right now.

 

[Dispatcher]: We got people going, sir.





[17]
The medical examiner
testified Cantu was approximately five feet, one inch in height and  weighed 217 pounds.  





[18]
Cantu=s blood was found on the floor in
the master bedroom, on the sheets, and on a pillow near the headboard where the
phone was located.  The Ablood trail@ also showed there were two sets of
bloody footprints in the master bedroom.  






[19]
See Swearingen v. State, 101 S.W.3d 89, 97 (Tex. Crim.
App. 2003); Johnson v. State, 959 S.W.2d 284, 287 (Tex. App.BDallas 1997, pet. ref'd). 





[20]
See Gutierrez v. State, 85 S.W.3d 446, 450-51 (Tex. App.BAustin 2002, pet. ref=d) (holding jury could reasonably
reject defendant=s self-defense claim where
defendant admitted stabbing victim and victim was not in possession of a
weapon, had defensive wounds on hands, and stab wounds in his back). 





[21]
Bone v. State, 77 S.W.3d 828, 832 (Tex. Crim.
App. 2002). 





[22]
Stone v. State, 17 S.W.3d 348, 350 (Tex. App.BCorpus Christi 2000, pet. ref=d) (citing McFarland v. State,
845 S.W.2d 824, 843 (Tex. Crim. App. 1992)). 






[23]  See Davis v. State, 930 S.W.2d 765, 767 (Tex. App.BHouston [1st Dist.] 1996, pet. ref=d). 






[24]  McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim.
App. 1996).  





[25] See Thompson,
9 S.W.3d at 813-14. 





[26]
See Hawkins v. State, 660 S.W.2d 65, 75 (Tex. Crim.
App. 1983).





[27]
Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim.
App. 1994). 





[28]
See Moore v. State, 694 S.W.2d 528, 531 (Tex. Crim.
App. 1985).





[29]
See Jackson v. State, 973 S.W.2d 954, 957 (Tex. Crim.
App. 1998) (holding appellant was obliged to prove a motion to suppress would
have been granted in order to satisfy Strickland).





[30]
Ransom v. State, 920 S.W.2d 288, 299 (Tex. Crim.
App. 1994); Brown v. State, 657 S.W.2d 117, 119 (Tex. Crim. App.
1983) (noting conduct of the accused showing a consciousness of guilt, such as
suppression of the testimony of a witness, is admissible as circumstance
tending to prove the accused committed the charged offense); Greene v. State,
928 S.W.2d 119, 123 (Tex. App.BSan Antonio 1996, no pet.). 





[31]
Greene, 928 S.W.2d at 124. 





[32]
See Abbott v. State, 726 S.W.2d 644, 649 (Tex. App.BAmarillo 1987, pet. ref=d) (finding counsel=s failure to request limiting
instruction was reasonable trial strategy where counsel did not wish to remind
jury of such matters).   





[33]
See id.  





[34]
Jones v. State, 37 S.W.3d 552, 555 (Tex. App.BBeaumont 2001, no pet.). 





[35]
See Strickland, 466 U.S. at 692.