

**NUMBER 13-08-00609-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ALICIA BROWN,                                                            **Appellant,**

**v.**

THE STATE OF TEXAS,                                                **Appellee.**

**On appeal from the 117th District Court
of Nueces County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza
Memorandum Opinion by Justice Garza**

Appellant, Alicia Brown, was convicted of murder, a first-degree felony, and aggravated assault, a second-degree felony. *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2003), § 22.02 (Vernon Supp. 2009). The jury found Brown to be a repeat felony offender and sentenced her to sixty years' imprisonment on the murder charge and forty years' imprisonment on the aggravated assault charge, with the sentences to run concurrently. *See id.* § 12.42(b), (c)(1) (Vernon Supp. 2009). By two issues on appeal, Brown argues that (1) the evidence was legally and factually insufficient to support her conviction for murder, and (2) the sentences imposed by the jury are unconstitutionally disproportionate

to the seriousness of the charged offenses.  We affirm.

## I. BACKGROUND

This case arose from an incident occurring outside the Club Hypnotic nightclub in Corpus Christi, Texas, in the early morning hours of March 21, 2008.  Miebony Rabb testified that she was at the club with her friend Roshanda Clay on that evening.  She stated that Brown was also at the club that night.  Brown was accompanied by her friend, Kimalyia Johnson, and Brown's niece, Holly Rios.  Rabb testified that, at some point during that evening, a brief altercation took place in the club between Johnson and Clay.  When Rabb and Clay eventually exited the club at around 2:00 a.m., they sat down on a car just outside the exit.  According to Rabb, Brown then also exited the club, followed by Johnson and Rios.  Brown then approached Clay and said, "Bitch, you're going to stop fucking with my niece."  Rabb testified that Brown then "started stabbing" Clay.  Rabb observed Clay fall off the car, at which point Brown "turned towards me and said, 'Bitch, you want some too,' and stabbed me."  Rabb stated that, as Brown walked away, she saw Brown holding what appeared to be a steak knife with a brown handle.  Rabb's injuries required surgery, and she was hospitalized for six days.  Clay, who was stabbed in the neck, died of her injuries before paramedics arrived.

On cross-examination, Rabb acknowledged that she had "a couple of drinks" that night, and that she had used PCP, ecstasy, and marihuana in the days leading up to March 21, 2008, but that her senses were not impaired at the time of the incident.  She also admitted that she was unable to pick Brown out of a photo lineup three days after the incident, while she was still in the hospital recovering from surgery.

Dawn Davis, a friend of Rabb and Clay, testified that she was walking out of the club when Clay walked in, bleeding profusely.  Davis acknowledged that she had previously told police that Clay, while dying, had said that "Holly" was the one who stabbed her.  However, at trial, Davis stated that she did not recall who actually said the word "Holly" or what was

2

meant by it.

Johnson testified that she accompanied Brown and Rios to the club that evening. She stated that Clay "kind of pushed" her at one point, but that she "wasn't worried about it." Later, after Clay and Rabb walked outside, Brown looked at Johnson and her friends and said "You-all slipping, you-all letting them 'hos leave." Johnson then saw that Brown and Clay were "fighting," and she also saw that Brown had a knife, but she did not know at the time that anyone had been stabbed. Johnson stated that she and Rios exited the club together and that neither of them fought with Clay or Rabb. Johnson then got into a car with Brown and Rios and the group left the scene. While in the car, Johnson heard Brown saying "'I got that 'ho,' or something like that."

Shaniqua Sanders testified that she witnessed Brown attack Clay and Rabb, but she did not see Brown carrying a weapon. According to Shaniqua, Brown asked Rios "if that was the right person" after she attacked Clay and Rabb. Shaniqua stated that Rios and Johnson did not participate in the attack, but rather stayed in their vehicle. Sheena Coats, Johnson's friend, also witnessed the attacks and stated that Brown struck Clay "[a] couple of times," but that she did not see any weapon in Brown's hands at the time. Coats also stated that Brown was alone when she attacked Clay and Rabb.

Latasha Sanders testified that she was talking to Rabb outside of the club when Brown came outside and said, "'Who is she?'" Brown then started fighting with Clay, after which Clay jumped off the car she was sitting on "because she was full of blood." Latasha stated that "[t]here was a lot of light" where the altercation took place and that she had "a good view" of what occurred. She did not see anyone carrying a knife. On cross-examination, Latasha admitted that she was shown two photo lineups by police; she failed to pick out Brown as Clay's attacker on the first lineup, but did so on the second lineup the following day. She denied having told anyone that Rios was the one that attacked Clay and Rabb.

3

Jessica Benson stated that she was in the restroom at Club Hypnotic when her friends Clay and Rabb were stabbed. When she came out of the restroom and went outside, she saw that Clay and Rabb were injured. Rabb "just kept saying, 'Holly and her auntie, Holly and her auntie.'" Clay "was gasping for air and 'Holly' was her last words [sic]."[1]

Detectives Sarah Akin and Ralph Lee of the Corpus Christi Police Department interviewed Brown on the day after the incident. A video recording of the interview was introduced into evidence.[2] According to Detective Akin, Brown initially denied having any knowledge of the attacks on Clay and Rabb, but she acknowledged being at Club Hypnotic on the night in question. Detective Akin testified that, toward the end of the interview, Brown changed her story about what happened that night:

| A. [Detective Akin] | . . . Detective Lee had asked me if I had any other questions for her before we left. And at that time I made a comment that—that I thought that—I think she had made a couple of comments about family and how family was very important to her. And I believe at that point I made a statement that I thought that that was why the incident had occurred, was because she was trying to protect her family. |
|---|---|
| Q. [Prosecutor] | And she—that spoke to her? |
| A. | Yes. At that point she broke down and it went from there. |
| Q. | And she told you that you were right? |
| A. | Yes. . . . [S]he said that she had seen some people who were causing problems with Kimalyia, and initially it was Kimalyia, I believe, and that they had been causing problems with her in the club while they were inside. She got angry, that made her angry, and she |

---

[1] Benson also stated that she went to the police station after the incident and that, while there, she overheard Latasha, her friend, state that she had seen Rios stab Clay. The trial court, however, instructed the jury that Benson's testimony with respect to Latasha's statement at the police station was to be considered only for the purposes of impeaching Latasha, and not for the truth of the matter asserted. *See* TEX. R. EVID. 802 ("Hearsay is not admissible except as provided by statute or these rules . . . .").

[2] The record on appeal does not contain a copy of the video recording, nor does it contain a transcript of the interview.

said she saw the same girls outside. And when she saw them, she kind of—a friend of hers was there who gave her a knife, and she took the knife and went and stabbed the girls.

Detective Akin stated that she did not believe that Brown's confession was false "because of her demeanor, because of the specifics that she gave on some of the stuff that was involved. [Brown] never said that anyone else was involved, she took responsibility." Detective Lee also testified that Brown's confession seemed genuine and "right because from the—from the other witnesses that we talked to and what she said, they matched up."

Brown testified in her own defense. She stated that, when she left the club that night, she saw Clay and Rabb sitting on a car outside. Brown continued her testimony on direct examination as follows:

| | |
|---|---|
| A. [Brown] | And then Ms. Rabb jumped off the car and she start fighting Holly, which I knew she was pregnant, so I told my friend to give me a knife, because they all had knives. |
| Q. [Defense counsel] | Okay. |
| A. | Because they had already went to—they all had it in their purse. And so as I was going, proceeding to them, they—they was standing up there, so I just—I stuck Ms. Clay in the back, to get her off my niece, and I pushed her off. |
| Q. | And who— |
| A. | And I told them— |
| Q. | Ms. Clay or Ms. Rabb? |
| A. | Ms. Rabb. |
| Q. | Okay. And is that—is that the one that survived? |
| A. | Yes. |
| Q. | Okay. Now, let's—let's back up a little bit. Why did you go get a knife? |
| A. | Because they all had knives. |
| Q. | Okay. |

| | |
|---|---|
| A. | And it happened so fast, I didn't know what to do. I—I was scared that he was going on [sic], you know, hurt somebody else. |
| Q. | Okay. So when you were walking over there, after you got a knife, who did you get it from? |
| A. | I got it from my friend that was from Kingsville. |
| Q. | Okay. Somebody that was there? |
| A. | Yes. |
| Q. | Okay. What did you do—when you finally got the knife in your hand, what happened? |
| A. | I popped it open. |
| Q. | Okay. Was it a steak knife? |
| A. | No, it was a pocket knife. |
| Q. | Okay. Is this something that you had on your person or in your boot? |
| A. | No. He gave it to me personally. He was out there, he walked with us. |
| . . . . | |
| Q. | So then after you got the knife in your hand, what did you do? |
| A. | I—I proceeded to stick Clay. |
| Q. | Okay. |
| A. | Rabb, I mean. |
| Q. | Rabb? |
| A. | Yes. |

Brown testified that she attacked Rabb because she felt that the life of her pregnant niece, Rios, was in danger. She further stated that she was not telling the truth when she made her initial statement to police—that she had stabbed both Rabb and Clay—because she was attempting to protect Rios. She claimed, in fact, not to know who had stabbed and

6

murdered Clay.

The jury found Brown guilty of the murder of Clay and the aggravated assault of Rabb.[3] This appeal followed.

## II. DISCUSSION

### A. Evidentiary Sufficiency

By her first issue, Brown argues that the evidence adduced at trial was legally and factually insufficient to support her conviction for murder.

In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). We must give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). We are not required to determine whether we believe that the evidence at trial established guilt beyond a reasonable doubt; rather, when faced with conflicting evidence, we must presume that the trier of fact resolved any such conflict in favor of the prosecution, and we must defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). In conducting a factual sufficiency review, we consider the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). The verdict will be set aside only if (1) it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, or (2) it is against the great weight and preponderance of the evidence. *Id.* at 415 (citing *Johnson v. State*, 23 S.W.3d 1, 10 (Tex. Crim. App. 2000)).

---

[3] The jury also found that Brown had previously been convicted of a felony. Accordingly, the aggravated assault conviction was enhanced from a second-degree felony to a first-degree felony, and the minimum end of the applicable punishment range for the murder conviction was enhanced from five years' imprisonment to fifteen years. *See* TEX. PENAL CODE ANN. §§ 12.32(a), 12.42(b), 12.42(c)(1) (Vernon Supp. 2009).

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Under such a charge, Brown committed the offense of murder if she: (1) intentionally or knowingly caused Clay's death; or (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Clay's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (b)(2).

Brown argues that the evidence used to convict her for murder was "inconclusive and ambiguous," noting that two witnesses, Davis and Benson, stated that they heard Clay identify "Holly" as her assailant before she died. However, it is well-established that the jury bears the sole responsibility to judge the credibility of witnesses, and the jury is free to believe or disbelieve any portion of a witness's testimony. *See, e.g., Cain v. State*, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997); *Ortega v. State*, 207 S.W.3d 911, 920 (Tex. App.–Corpus Christi 2006, no pet.). Moreover, it is within the sole province of the jury to reconcile conflicts, contradictions, and inconsistencies in the evidence and testimony. *Swearingen v. State*, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003); *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982). We must presume that the jury resolved any conflicts in favor of the prosecution, and we must therefore defer to the jury's determination that Davis and Benson were incorrect in their testimony that Clay had identified Rios as her assailant. *See Turro*, 867 S.W.2d at 47. The jury was also free to disbelieve Brown's trial testimony, in which she denied stabbing Clay, and instead to believe Brown's initial statement to police, in which she admitted to stabbing both Clay and Rabb. *See id.*

Other evidence supporting Brown's conviction for Clay's murder includes: (1) Rabb's testimony that Brown stabbed Clay and that Brown was carrying a knife; (2) Johnson's testimony that she saw Brown and Clay fighting and that Brown subsequently said "'I got that 'ho,' or something like that"; (3) Shaniqua Sanders's testimony that she saw

8

Brown attack Clay; (4) Coats's testimony that she saw Brown attack Clay; (5) Latasha Sanders's testimony that she saw Brown attack Clay; and (6) the testimony of Detectives Akin and Lee that Brown confessed to stabbing Clay. From this evidence, a reasonable jury could have easily found beyond a reasonable doubt that Brown intentionally or knowingly caused Clay's death. *See Sanders*, 119 S.W.3d at 820. Accordingly, the evidence is legally sufficient to support the jury's verdict.

Considering all the evidence, we further conclude that the verdict is not clearly wrong, manifestly unjust, or against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 415. The evidence is therefore factually sufficient to support Brown's murder conviction. We overrule Brown's first issue.

## B.     Disproportionate Sentences

By her second issue, Brown complains that the punishments assessed are disproportionate to the seriousness of the alleged offenses, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. *See* U.S. CONST. amends. VIII, XIV. However, Brown did not object to her sentences at the time of sentencing or in any post-trial motion. To preserve error for appellate review, a defendant must present a timely objection to the trial court, state the specific grounds for the objection, and obtain a ruling. TEX. R. APP. P. 33.1(a). Even certain constitutional guarantees are also subject to forfeiture if a proper objection was not made at trial. *Saldano v. State*, 70 S.W.3d 873, 887 (Tex. Crim. App. 2002). Courts have consistently applied this rule when considering a challenge to a sentence as unconstitutionally disproportionate. *See Noland v. State*, 264 S.W.3d 144, 151 (Tex. App.–Houston [1st Dist.] 2007, pet. ref'd); *Trevino v. State*, 174 S.W.3d 925, 928 (Tex. App.–Corpus Christi 2005, pet. ref'd); *see also Guzman v. State*, No. 13-09-00132-CR, 2010 Tex. App. LEXIS 3812, at *3-4 (Tex. App.–Corpus Christi May 20, 2010, no pet.) (mem. op., not designated for publication). Because Brown failed to specifically object to the allegedly disproportionate sentences in the trial court, she has not

preserved this issue for our review.  *See* TEX. R. APP. P. 33.1(a); *Noland*, 264 S.W.3d at 151; *Trevino*, 174 S.W.3d at 928.  We overrule Brown's second issue.

### III. CONCLUSION

We affirm the judgment of the trial court.


_____
DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
24th day of August, 2010.

10